UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> JENETTE GEORGE, ) <br> ) <br> Defendant. ) | Case No. 12 CR 559-7 <br><br> Judge John W. Darrah |

**MEMORANDUM OPINION AND ORDER**

On March 18, 2015, Defendant, Jenette George, and three co-defendants were charged in a Second Superseding Indictment for their respective roles in an alleged Medicare-fraud scheme. The indictment charged Defendant with two counts of receiving kickbacks for Medicare referrals in violation of 42 U.S.C. § 1320a-7b(b)(1)(A), on or about April 12, 2012, and on or about May 17, 2012. Defendant was also charged with one count of conspiring to pay or offer kickbacks, beginning on or about November 2010 to July 2012, in violation of 18 U.S.C. § 371. A bench trial was held from October 20, 2015 to October 22, 2015.

This matter now comes before the Court following the presentation of evidence. The Court has considered the evidence, particularly including careful attention to the testimony of witnesses. The Court, in weighing the testimony of the witnesses, has considered: (1) the witnesses' intelligence; (2) the witnesses' memories; (3) the witnesses' abilities and opportunities to observe; (4) the witnesses' manners while testifying; (5) any interest, bias, or prejudice of the witnesses; and (6) the reasonableness of the witnesses' testimony when considered in light of all the evidence in the case. The Court has further considered the written arguments submitted by counsel for the parties and the authority cited therein. For the following

1

reasons, the Government has proven, beyond a reasonable doubt, that Defendant is guilty of violating 42 U.S.C. § 1320a-7b(b)(1)(A) and 18 U.S.C. § 371.

## FINDINGS OF FACT

Starting in 2007, Defendant worked for Help at Home, a home health-care agency, and became a Certified Homemaker. In 2010, Defendant decided to start a referral agency named Ttenej Senior Referral Agency. Through a friend, Defendant met Titis Jackson and Gary Hernal. Defendant told Hernal that she would be interested in doing marketing referrals for Rosner Home Health Care, Inc, for which Hernal worked. On November 17, 2010, Defendant and Hernal signed a "Work for Hire Agreement," which stated:

> Beginning on November 8, 2010, Ttenej Senior Referral Agency will provide the following services for Rosner Home Health Care, Inc.:
> a. Organize and prepare Health Fairs and any services pertaining to duties expected by said agency.
> b. Visit doctors, hospital case managers, discharge planners or social workers and convince them to refer patients to Rosner Home Health Care Inc.

(Def's Exh. 6.) The agreement provided that payment for services would be "in the amount of equal to the services rendered." (*Id.*) The agreement also provided that Ttenej Senior Referral Agency was "an independent referral agency with respect to employment and not an employee of Rosner Home Health Care, Inc." (*Id.*) Defendant then began referring patients to Rosner Home Health Care, Inc.. Defendant sent an e-mail to Hernal on March 10, 2011, expressing concern that their arrangement may not be within the law. (Def's Exh. 9.)

Hernal began to cooperate with law enforcement in an investigation of Rosner on March 14, 2012. On March 23, 2012, Hernal told Defendant that he had a check for Defendant for two patients. (Gov't. Exh. 41.) On another call, later that day, Defendant asked to speak to "Nerie" (co-defendant Ana Nerissa Tolentino) about her payments. (*Id.*) Hernal told Defendant that she was being paid for two patients: Frank Perry and Jamie George. (*Id.*) Defendant

received a check for $1,000 from Hernal dated March 23, 2012. (Gov't Exh. 3/23 Photos.)[1] Hernal told her that she would have five patients on the next paycheck including: Mary Mitchell, William Adams, LaQuita Talley, and Charlene Collins. (Gov't. Exh. 41.) On April 5, 2012, Hernal called Defendant and said that he had two checks for Defendant: one check for $1,000 and another for $1,500. Defendant received two checks dated April 6, 2012, totaling $2,500. (Gov't Exh. 4/6/12 Photos.)

On April 12, 2012, Defendant came in to see Hernal, who gave Defendant a $1,000 check and $2,500 in cash. (Gov't Exh. 4/12 Recording; Gov't Exh. 4/12 Photos). The cash and check were placed into an envelope marked "Jiye" which was another name for Defendant. (*Id.*) Patient-referral logs[2] indicate that seven patients were "done"[3] on April 12, 2012. *See* (Gov't Exhs. 43, 45).

On May 17, 2012, Defendant was given $500 in cash and a check for $1,000 by Hernal. (Gov't Exh. 5/17 Recording.) Hernal, Defendant, and co-defendant Tolentino went over a patient-referral log and discussed payments. (*Id.*) The referral log has three patients with "done" dates of May 17, 2012: Mary Norman, Samantha Brant, and Latasha Letters. (Gov't Exh. 5/17 Photos.)

On May 31, 2012, Defendant was given $500 in cash and a check for $1,000 in an envelope labeled "Jiye George". (Gov't Exh. 5/31/12 Photos.) The referral log for that date has three patients with "done" dates of May 31, 2012: Richard Norman, Maggie Grigsby, and

---

[1] Audio and video recordings of some of these meetings were made by Hernal without Defendant's knowledge, and photos of the checks and cash were made by law enforcement prior to the payments made to Defendant.

[2] Rosner used referral logs to keep track of Defendant's patient referrals and corresponding payments. Columns on the referral logs include: (1) Patient; (2) Referral Date; (3) SOC Nurse; (4) SOC Date; (5) Comments; and (6) Status.

[3] Defendant testified that she was paid for patients on their "done" dates.

3

Sally Green.  (*Id.*)

On June 21, 2012, Hernal gave Defendant a check for $1,000. (Gov't Exh. 6/21 Recording; Gov't Exh. 6/21 Photos.)  The referral log for that date has two patients with "done" dates of June 19, 2012:  JC Tribbett and Bobbie J. Cathey.  (Gov't Exh. 6/21 Photos.)  The recording shows Hernal and Defendant discussing that the check is for those two patients. (Gov't Exh. 6/21 Recording.)

On July 13, 2012, Hernal gave Defendant a check for $1,000.  (Gov't Exh. 7/13 Photos; Gov't Exh. 7/13 Recording 1.)  The referral log for that date has two patients with "done" dates of July 13, 2012:  Thelma Williams and Willie Martin. (Gov't Exh. 7/13 Photos.)  On the recording, Hernal tells Defendant that the check is for those two patients.   (Gov't Exh. 7/13 Recording 1.)  Hernal asked why Defendant preferred check payments, but Defendant stated that her referrals could all be cash.  (*Id.*)  Hernal informed Defendant that two home health agencies were "busted for exactly what we're doing here, you know, getting paid for, for patients." (Gov't Exh. 7/13 Recording 1; Gov't Exh. 40, Tab 11.)  Defendant responded, "Right."  (*Id.*) Hernal informed Defendant that paying her per patient was illegal and told her to be careful. (Gov't Exh. 7/13 Recording 1.)  Defendant asked Hernal, "Okay, careful how?"  (Gov't Exh. 7/13 Recording 1; Gov't Exh. 40, Tab 11.)  Defendant asked if she could be put on payroll, but Hernal said that she could not because she is a contractor.  (*Id.*)  Defendant said that was sending "mixed signals" because it was illegal for her to be paid for doing referrals but for other services people are paid from the agency.  (*Id.*)  Hernal again reiterated that being paid per patient is illegal.  (*Id.*)  Defendant responded, "As long as it's just between the two parties, it shouldn't be no [*sic*] problem."  (Gov't Exh. 7/13 Recording 1; Gov't Exh. 40, Tab 11.)

4

On July 19, 2012, Hernal gave Defendant a check for $1,000. (Gov't Exh. 7/19 Recording B; Gov't Exh. 7/19 Photos.) The referral log for that date has two patients with "done" dates of July 19, 2012: Christine Brown and Madeline Durham. (Gov't Exh. 6/21 Photos.) The recording shows Hernal telling Defendant that the check is for those two patients. (Gov't Exh. 7/19 Recording B.)

Defendant was arrested on July 25, 2012. Kathy Krause, Special Agent for the United States Department of Health and Human Services, conducted an interview with Defendant on the date of her arrest.[4] Defendant was read her *Miranda* rights and waived them. Defendant was interviewed for approximately two hours. Defendant stated that she received biweekly checks from Rosner in the amount of $1,000. Defendant also stated that the payments were not for per-patient referrals and that she knew that it was illegal to be paid per patient for referrals to home health agencies. Defendant told agents that she was only paid by check.

Krause then showed Defendant the video recordings from April 12, 2012, and May 17, 2012. After watching the recordings, Defendant said that she had lied and that she was paid $500 per patient that enrolled at Rosner. Defendant stated that when she began receiving payments in cash, sometime around November 2011, she realized that it was illegal to be getting paid per patient.[5] Defendant also told Krause that she had drafted an agreement with Rosner that included a provision for $500 per patient referral but that Hernal took this language out. Defendant also admitted that she was paid both by check and in cash.

---

[4] Defendant makes an argument that her recorded comments and responses in the interview are not admissions against interest. However, they are "voluntary and . . . nonhearsay admissions of a party-opponent under FRE 801(d)(2)(A)." *Jordan v. Binns*, 712 F.3d 1123, 1130 (7th Cir. 2013).

[5] During her testimony at trial, Defendant denied making this statement.

Bank records show that the cash and checks given to Defendant were deposited in bank accounts controlled by Defendant. *See* (Gov't Exhs. 47, 48.) The Government also presented evidence showing that Rosner submitted claims to Medicare that included treatment for patients referred by Defendant. *See* (Gov't Exh. 51.)

## CONCLUSIONS OF LAW

### *Anti-Kickback Statute*

To find Defendant guilty of an Anti-Kickback Statute violation under 42 U.S.C. § 1320a-7b(b)(1)(A), the Government must prove, beyond a reasonable doubt: (1) Defendant knowingly and willfully solicited or received any remuneration (including any kickback, bribe, or rebate); (2) the remuneration was in return for referring an individual to Rosner Home Health Care, Inc. to provide services or arrange to provide services; and (3) those services may be paid in whole or in part under Medicare. *See United States v. Borrasi*, 639 F.3d 774, 781 (7th Cir. 2011); 42 U.S.C.A. § 1320a-7b(b)(1)(A).

Defendant makes an argument, based on the law, that her business arrangements with Rosner are not covered by the Anti-Kickback Statute. Specifically, Defendant argues that receiving a flat sum for each patient referred by a marketer is legal because the patients were certified for care only after a physician's examination. Defendant refers to four cases: *United States v. Polin*, 194 F.3d 863 (7th Cir. 1999); *United States v. Miles*, 360 F.3d 472 (5th Cir. 2004); *United States v. Vernon*, 723 F.3d 1235 (11th Cir. 2013); and *United States v. Patel*, 778 F.3d 607 (7th Cir. 2015).

In *Polin*, defendants were engaged in a conspiracy regarding a referral arrangement with a sales representative for pacemakers. For each patient that the sales representative referred to defendants' company for monitoring services, the sales representative would receive a flat fee of

6

fifty dollars.  *Polin*, 194 F.3d at 865.  The sales representative would not receive compensation "if the patient said no, if the physician said no, if the patient died before monitoring services began, or if the patient was in a nursing home with which [defendants' company] already had a monitoring contract."  *Id.*  The Seventh Circuit described this as a "classic kickback scheme."  *Id.*  The defendants in *Polin* argued that they were not engaged in a referral scheme because physician approval was needed before care could begin.  *Id.* at 866.  However, the Seventh Circuit rejected this argument, holding that it "would lead to absurd results."  *Id.*

In *Miles*, a home health company paid defendants to distribute information regarding home health services to doctors.  *Miles*, 360 F.3d at 479.  If those physicians referred patients to the home health company, defendants would receive a five-hundred-dollar payment per patient.  *Id.*  The Fifth Circuit agreed that defendants "never actually referred anyone" to the home health company, "but simply engaged in advertising activities."  *Id.* at 480.  The Fifth Circuit distinguished the Seventh Circuit's decision in *Polin* because, in *Polin*, the "salesman would make the decision as to which service provider to contact for the patient."  *Id.*

In *Vernon*, the owners of a specialty pharmacy paid individuals and businesses if they would refer their clients to the specialty pharmacy for prescription filling.  *Vernon*, 723 F.3d at 1241.  Defendants argued that only physicians could make referrals and that defendants only gave recommendations, which the Eleventh Circuit rejected.  *Id.* at 1267.  The court held that defendants were "effectively responsible for deciding which specialty pharmacy to use."  *Id.* at 1254.  In *Patel*, a doctor certified patients for home health services and directed them towards a particular agency.  *Patel*, 778 F.3d at 612-13.  The Seventh Circuit held that Congress intended the Anti-Kickback Statute "to criminalize the receipt of kickbacks in return for a physician's certification or recertification," as well as "steering a patient to a particular provider."  *Id.* at 615,

7

616. The term "referrals" meant "directing a patient to a provider, or . . . certifying or recertifying patients for Medicare-reimbursed care." *Id.* at 618.

Defendant's actions are distinguishable from the defendant in *Miles*. Defendant referred specific patients to Rosner, effectively telling the patients to go there for home health services. Moreover, the Fifth Circuit later rejected Defendant's interpretation of *Miles* in *United States v. Shoemaker*, 746 F.3d 614, 628 (5th Cir. 2014). The emphasis on "relevant decisionmakers" was to draw a distinction "between a payer's intent to induce 'referrals,' which is illegal, and the intent to compensate advertisers, which is permissible." *Shoemaker*, 746 F.3d at 628. Defendant, here, argues that she did not authorize Medicare services; however, like the defendants in *Vernon*, Defendant was effectively responsible for deciding which home health service the patients used. Further, the court in *Vernon* held the fact defendants could not actually prescribe the treatment was irrelevant. *Vernon*, 723 F.3d at 1254. The Seventh Circuit has also rejected the argument that the Anti-Kickback Statute requires authorizing Medicare services as leading to absurd results. And *Patel* makes clear that, under the Anti-Kickback Statute, referrals direct a patient to a provider *or* authorize a patient for Medicare-reimbursed care. Physicians did not refer patients to Rosner; Defendant did.

Defendant also argues that being paid on a per-patient basis is lawful. Under federal regulations, remuneration does not include a payment made by a principal to an agent as compensation for the services of the agent, as long as certain standards are met, including:

> [t]he *aggregate compensation* paid to the agent over the term of the agreement *is set in advance*, is consistent with fair market value in arms-length transactions and is *not determined in a manner that takes into account the volume or value of any referrals* or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

8

42 C.F.R. § 1001.952(d)(5) (emphasis added).  This regulation clearly indicates that payment on a per-patient basis is based on the volume of referrals and is therefore remuneration for the purposes of the Anti-Kickback Statute.  Defendant's actions in this case are clearly referrals under the Anti-Kickback Statute.

*Conspiracy*

Defendant is alleged to have engaged in a conspiracy to offer or pay her kickbacks in violation of 18 U.S.C. § 371.  Under 42 USC § 1320a-7b(b)(2)(A), "whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . shall be guilty of a felony."  42 U.S.C § 1320a-7b(b)(2)(A).  "To satisfy its burden of showing that Defendant engaged in the alleged conspiracy, the Government must prove three elements beyond a reasonable doubt:  (1) that the alleged conspiracy existed; (2) that Defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy; and (3) that one of the conspirators committed an overt act in an effort to advance the goal of the conspiracy."  *United States v. Patel*, 17 F. Supp. 3d 814, 824 (N.D. Ill. 2014) aff'd, 778 F.3d 607 (7th Cir. 2015) (citing 18 U.S.C. § 371; *United States v. Kruse*, 606 F.3d 404, 408 (7th Cir.2010); Pattern Criminal Jury Instructions of the Seventh Circuit 5.08A (2012)).

A defendant joins a conspiracy if she agrees with a conspirator to participate "in the project or enterprise that is the object of the conspiracy and knowingly acts in furtherance of that object."  *United States v. Balistrieri*, 779 F.2d 1191, 1225 (7th Cir. 1985).  It does not matter if a defendant has not met or agreed with every conspirator.  *Id.*  "The government need not prove

9

that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy." *United States v. Rogan*, 459 F. Supp. 2d 692, 719 (N.D. Ill. 2006) aff'd, 517 F.3d 449 (7th Cir. 2008) (citing *United States v. Liefer*, 778 F.2d 1236, 1247 n. 9 (7th Cir. 1985); *United States v. Towers*, 775 F.2d 184, 189 (7th Cir. 1985)).

## ANALYSIS

### *Anti-Kickback Violation*

As set out in detail above, in order to find Defendant guilty of an Anti-Kickback Statute violation, it must be proven, beyond a reasonable doubt: (1) Defendant knowingly and willfully solicited or received any remuneration; (2) the remuneration was in return for referring an individual to Rosner Home Health Care, Inc. to provide, or arrange to provide, services; and (3) those services may be paid in whole or in part under Medicare.

As to the first element, the evidence has proven, beyond a reasonable doubt, that Defendant was paid a fee on a per-patient-referral basis, taking into account the volume of referrals. Defendant also admitted that she was paid $500 every time a patient was admitted or readmitted. However, as to this element, Defendant argues the Government made an inadequate showing that her conduct was knowing and willful. "A person acts knowingly if [she] realizes what [she] is doing and is aware of the nature of [her] conduct, and does not act through ignorance, mistake, or accident." Seventh Circuit Pattern Criminal Jury Instruction 4.10 (2012). In the context of healthcare statutes, the Seventh Circuit has stated, ". . . the use of 'knowingly and willfully' in § 669 [healthcare theft] may require that a defendant know that his conduct was in some way unlawful." *United States v. Wheeler*, 540 F.3d 683, 690 (7th Cir. 2008). "A person acts willfully if he acts intentionally and purposely and with the intent to do something that the law forbids, that is, with the bad purpose to disobey or disregard the law." *Bryan v.*

10

*United States*, 524 U.S. 184, 190 (1998). The person does not need to be aware of the specific law or rule, but defendant "must act with the intent to do something that the law forbids." *Id.*

In her interview with agents of the U.S. Department of Health and Human Services, Defendant admitted that she realized it was illegal to be getting paid per patient in November 2011. Defendant continued sending patients to Rosner and accepting payment on a per-patient basis for almost a full year after November 2011, until her arrest. Defendant also admitted that she lied to the investigators when she initially told them that she was paid a flat fee by Rosner and not on a per-patient basis. The July 13, 2012 recording discussed above also indicated that Defendant knew her conduct was illegal.

Further, during cross-examination, Defendant admitted to reading a book, the *Ultimate Guide to Home Health Marketing*, that contained warnings that being paid for patient referrals was illegal. On the first page of the first chapter, the book states:

> It is common knowledge that providers *cannot pay anyone* for referring a patient for services, but this statute goes well beyond simply paying someone for a referral. The anti-kickback statute prohibits any arrangement between a provider and another party where one purpose of the arrangement is to induce referrals. In addition, a payment under the anti-kickback statute does not include just money, but includes anything of value.

(Def's Exh. 8, p. 1) (emphasis added). Defendant also stated that she read enough of the book to have concerns about the legality of her arrangement with Rosner. Defendant testified that she did not read the language set out above, warning against being paid for referrals. Her testimony in this regard was not credible. The Government proved Defendant's conduct in accepting the payments was knowing and willful, beyond a reasonable doubt.

As to the second element, the referral logs, photographs, and audio and visual recordings show, beyond a reasonable doubt, that the payments were in return for referring individuals to Rosner Home Health Care, Inc. to provide services or arrange to provide services. *See* (Gov't.

11

Exhs. 41, 43, 45; Gov't Exh. 3/23 Photos; Gov't Exh. 4/6/12 Photos; Gov't Exh. 4/12 Recording; Gov't Exh. 4/12 Photos; Gov't Exh. 5/17 Recording; Gov't Exh. 5/17 Photos; Gov't Exh. 5/31/12 Photos.)

As to the third element, the Government presented evidence showing, beyond a reasonable doubt, that Rosner submitted claims to Medicare that included treatment for patients referred by Defendant. *See* (Gov't Exh. 51.)

The Government proved, beyond a reasonable doubt, that Defendant violated 42 U.S.C. § 1320a-7b(b)(1)(A), on or about April 12, 2012, and on or about May 17, 2012

*Conspiracy*

Defendant is alleged to have engaged in a conspiracy to offer or pay her kickbacks, as more fully set out above. The Government must prove three elements beyond a reasonable doubt: (1) that the alleged conspiracy existed; (2) that Defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy; and (3) that one of the conspirators committed an overt act in an effort to advance the goal of the conspiracy.

As to the first element, the Government proved, beyond a reasonable, doubt that the conspiracy existed. The Government presented evidence that Defendant entered into a per-patient referral relationship with Rosner in November 2010. While Hernal dropped out of the conspiracy when he became a Government informant, beginning on March 14, 2012, Defendant and Hernal had been engaged in the conspiracy up to that point. The Government also showed that co-defendant Tolentino was a member in the conspiracy. On March 23, 2012, Defendant asked to speak to Tolentino because she was concerned that Hernal was paying her differently than what Tolentino had told Defendant. (Gov't. Exh. 41; Gov't Exh. 61, Tabs 2 and 3.) Defendant also met with Tolentino and Hernal to review her payments on May 17, 2012. (Gov't

12

Exh. 5/17 Recording; Gov't Exh. 61, Tab 8.) They discussed whether patients had been admitted and whether Defendant should be paid for those patients. (*Id.*)

As to the second element, Defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy. Defendant admitted she realized in November 2011 that it was illegal to be getting paid per patient and continued to refer patients and receive payments. The Government has proven this element, beyond a reasonable doubt.

As to the third element, one of the conspirators committed an overt act in an effort to advance the goal of the conspiracy. As discussed above, Defendant, Hernal, and Tolentino committed several overt acts in an effort to advance the goal of paying and receiving kickbacks. The Government has proven this element, beyond a reasonable doubt.

The Government proved that Defendant was involved in a conspiracy in violation of 18 U.S.C. § 371 beyond a reasonable doubt.

*Safe-Harbor Provisions*

Defendant also argues that her actions fall under two "safe harbor" provisions or exceptions to the Anti-Kickback Statute. "Once the United States has demonstrated proof of each element of a violation of the [Anti-Kickback Statute], the burden shifts to the defendant to establish that his conduct was protected by a safe harbor or exception; the United States need not prove, as an element of its case, that defendant's conduct does not fit within a safe harbor or exception." *Rogan*, 459 F. Supp. 2d at 716. Safe-harbor provisions are an affirmative defense that must be proven by the Defendant. *United States v. Vernon*, 723 F.3d 1234, 1271 (11th Cir. 2013). In this case, Defendant must prove that, by a preponderance of the evidence, a safe-harbor provision applies. *See United States v. Jumah*, 493 F.3d 868, 873 (7th Cir. 2007) (where there is no statutory language otherwise and where the elements of an affirmative defense do not

13

negate an element of the offense, criminal defendants are required to prove affirmative defense by a preponderance of the evidence).

The Anti-Kickback Statute does not apply to "any remuneration between a health center entity described under clause (i) or (ii) of section 1396d(l)(2)(B) of this title and any individual or entity providing goods, items, services, donations, loans, or a combination thereof, to such health center entity pursuant to a contract, lease, grant, loan, or other agreement, if such agreement contributes to the ability of the health center entity to maintain or increase the availability, or enhance the quality, of services provided to a medically underserved population served by the health center entity." 42 U.S.C. § 1320a-7b(b)(3)(I). A health center entity as described under clause (i) or (ii) of § 1396d(l)(2)(B) is an entity receiving federal grants to establish health centers in medically underserved communities or an entity receiving funding from a grant by entering into a contract with an entity receiving a grant. *See* 42 U.S.C. § 1396d(l)(2)(B)(i)-(ii); 42 U.S.C. § 254b. There was no evidence presented that Defendant or Rosner was an entity described under § 1396d(l)(2)(B). Therefore, this safe-harbor provision does not apply.

The Anti-Kickback Statute also does not apply to "any amount paid by an employer to an employee (who has a *bona fide* employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a-7b(b)(3)(B). Defendant argues that her written agreement with Rosner created an employment relationship. However, Defendant admitted that she was not an employee of Rosner. And Hernal clearly told Defendant that she was not an employee but an independent contractor. Additionally, Defendant was paid for referrals and not for the provision of items or services covered by Medicare.

Defendant has failed to prove, by a preponderance of the evidence, that a safe-harbor provision applied to her conduct.

## CONCLUSION

For all the reasons discussed above, the Government has proven, beyond a reasonable doubt, both that Defendant is guilty of receiving kickbacks for Medicare referrals in violation of 42 U.S.C. § 1320a-7b(b)(1)(A) and that Defendant is guilty of conspiring to pay or offer kickbacks in violation of 18 U.S.C. § 371.

Date: March 22, 2016

JOHN W. DARRAH
United States District Court Judge